IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KELVIN O'NEIL GOREE, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| | : | NO. 19-3260 |
| v. | : | |
| | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                     October 26, 2020

This action was brought pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), which denied the application of Kelvin O'Neil Goree ("Goree") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 301, *et seq*. Presently before the Court is Plaintiff's Brief and Statement of Issues in Support of Request for Review ("Pl. Br.") (Doc. 8); Defendant's Response to Request for Review ("Def. Br.") (Doc. 13); Plaintiff's Brief in Reply to Defendant's Response to Plaintiff's Request for Review ("Pl. Reply") (Doc. 14); and the record of the proceedings before the Administrative Law Judge ("ALJ") (Doc. 7) (hereinafter "R."). Plaintiff asks the Court to vacate the Commissioner's final administrative decision and remand for further proceedings. The Commissioner seeks the entry of an order affirming the decision of the ALJ that the Plaintiff was not disabled. For the reasons set forth below, we affirm.

**I.   FACTUAL AND PROCEDURAL HISTORY**

   **A.   Benefits application and early treatment**

Goree protectively filed an application for DIB on March 16, 2016, when he was 56 years old. He dated the onset of his alleged disability to June 1, 2015, when he stopped working as a

1

forklift operator in an Amazon warehouse after his physician placed lifting restrictions on him due to his complaints of low back pain. Prior to that position, he had a long history of work as a maintenance electrician and building maintenance worker. (R. 138, 183, 334, 342.) He again worked as an electrician through an internship for Project HOME in 2016, after his alleged disability onset date. Earlier in his working life, he served in the Navy for five years, where he suffered an injury in 1983 to his ankle.

Goree contended that he was unable to work due to osteochondral lesions in his left ankle, tinnitus, post-traumatic stress disorder, and a herniated disc in the lumbar spine. (R. 333.) During the period of time at issue, he had lived with his daughter and at a home for veterans. He also had periods of homelessness. Goree received comprehensive care for his various conditions, as well as social work and housing referrals, at the VA Medical Center in Philadelphia. A board-certified internist, Leah Jones, M.D., principally managed his care for physical impairments, and psychiatrist Judith Navarro, M.D., saw him at the VA's Mental Health Clinic.[1]

**B.     Adjudication of application**

Based on the records before it at that time, the state agency denied Goree's claim on August 19, 2016. Upon Goree's request for reconsideration, and given the earnings records showing that he had been performing work since the date he initially filed his claim, the state agency sent him

---

[1] Goree's mental impairments are not the focus of this appeal, although they were among the impairments he identified as disabling. He has a history of alcohol dependence, cocaine and marijuana abuse, and depression. In February 2018, Goree was hospitalized for suicidal and homicidal ideation against a backdrop of life stressors and substance abuse. He was prescribed medications for depressive symptoms and to help him sleep. MRI studies of his brain also showed evidence of a traumatic brain injury ("TBI"). Upon discharge he displayed an improved mood. His diagnoses were polysubstance use disorder, depressive disorder, TBI, mild cognitive impairment and questionable post-traumatic stress disorder ("PTSD"). (R. 757-58.) He responded positively to subsequent outpatient treatment with Dr. Navarro at the VA clinic. Treatment notes from September 2018, closer to the time of the hearing, reflect that Goree reported low energy and self isolation, "bad" depression, and disturbed sleep. Dr. Navarro provided therapy and counseled against drug and alcohol use but otherwise maintained his medications. (R. 2467-70.)_

2

for consultative mental health and orthopedic examinations in July and August 2017. Of note here, Goree was examined on July 27, 2017 by Juan Carlos Cornejo, D.O. Dr. Cornejo also ordered and reviewed x-rays of the left ankle and lumbar spine, although he did not review any historical records. Dr. Cornejo reported that Goree was able to participate in the examination without difficulty and that findings on physical exam were largely normal. Dr. Cornejo noted tenderness in the left ankle area but otherwise saw no signs of atrophy or any indicia that Goree relied upon an assistive device for ambulation. Dr. Cornejo observed that Goree walked with a limp on the left during the evaluation but that the limp was less noticeable when he was observed leaving the office after the examination and walking without an aid to the train station, several blocks away.

To conclude the reconsideration process, Arvind Chopra, M.D., a medical doctor retained by the state agency, reviewed the expanded record and offered his opinion about Goree's physical functional capacity. Based upon his opinion, and considering one also offered by a reviewing psychiatrist, the state agency denied the claim on reconsideration on September 25, 2017. (R. 272-82.)

Goree requested a hearing and, through counsel, submitted additional medical records of his treatment at the VA. When asked by the ALJ at the November 20, 2018 hearing why he stopped working, he responded that it was due to his "bad back, and everything's messed up. I stutter. It's a mess." (R. 154.) The ALJ asked Goree about the cane that he brought to the hearing. In response to the question of when Goree acquired a cane, he answered that it was "as soon as [he] got out of the Navy," which was in 1983. Goree testified that despite having had ankle pain even dating back to his time in the Navy, he was able to work as an electrician because he was young and could put up with the pain. (R. 164.) Goree testified that even after he had to move from the place he lived with his adult daughter, he still relied on his daughter to make appointments for him, as he tends

to forget things.  (R. 158.) Referring to his daily life at the veterans' home, Goree testified that he lies around and watches movies on his phone.  (R. 158.)

Goree's daughter also testified at the hearing, reiterating statements she made in a Third Party Statement in December 2016.  In her statement, she had described his ADLs as watching television, reading and playing with her children, then aged 2 and 6.  (R. 389-96.)  She testified at the hearing that his physical condition worsened since then, as he was no longer able to go places with her kids.  (R. 175.)   At the hearing she also corroborated Goree's complaints of impaired memory and limited attention span, describing it as having deteriorated since early 2017.  (R. 179-80.) She testified that she could no longer let Goree watch her children without another adult being present.  (R. 172.)  She also confirmed he long had a cane but that he previously left it behind when he went to work.  She estimated that 2014 was the point in time at which Goree no longer walked without using the cane.  (R. 176.)

The ALJ issued his decision on February 22, 2019.  He determined that Goree was not disabled at any time since the June 1, 2015 alleged onset date in that, although he could not perform any of his past relevant work, there were other jobs that existed in significant numbers in the national economy that he could perform. (R. 139-40.)  The ALJ explained, as we discuss below, that in reaching this conclusion about Goree's functional capacity he gave "little weight" to a statement of Dr. Jones in which she opined that if Goree tried to work, he would frequently be absent, he would be off task 25% of the workday, he would require opportunities to lie down during the workday, and he would require a cane to ambulate more than 50 feet.  (R. 136-38.) The ALJ also gave little weight to aspects of the opinion of Dr. Cornejo that accompanied the report of his consultative examination of Goree in July 2017. He gave "great weight" to certain aspects of the opinion rendered in August 2017 by the state agency reviewing physician, Dr. Chopra.  (R.

4

135-36, 138.) Goree sought review in the Appeals Council and submitted approximately 100 pages of records from the VA to update his condition since the November 2018 hearing. That body, however, found no reason to set aside the ALJ's decision, leaving it the final decision of the Commissioner. (R. 1-6.) This litigation followed.

## II.    STANDARD OF REVIEW

This Court must determine whether substantial evidence supports the Commissioner's decision. 42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F. 3d 546, 552 (3d Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of evidence." *Rutherford*, 399 F.3d at 552. The factual findings of the Commissioner must be accepted as conclusive, provided they are supported by substantial evidence. *Richardson*, 402 U.S. at 390 (citing 42 U.S.C § 405(g); *Rutherford*, 39 F.3d at 552). The review of legal questions presented by the Commissioner's decision, however, is plenary. *Shaudeck v. Commissioner of Social Security Admin.*, 181 F.3d 429, 431 (3d Cir. 1999).

## III.    DECISION UNDER REVIEW

The issue before the ALJ at the time of his February 22, 2019 decision was whether Goree had been disabled within the meaning of the Act at any time since his June 1, 2015 alleged onset date. In making this determination, he relied upon the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a). At Step One, the ALJ found that Goree had not engaged in substantial gainful activity since the alleged onset date, except during the second quarter of 2016, as to which the ALJ's remaining findings would not apply. (R. 126.) At Step Two, he found that Goree had demonstrated that he suffered from a severe, medically-determinable impairment, *e.g.*, one that causes functional limitations and has more than a *de minimus* effect on his ability to

perform basic work activities. (R. 127.) At Step Three, the ALJ concluded that Goree did not have an impairment or combination of impairments that satisfy the criteria of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1, and therefore could not establish his entitlement to benefits on that basis, requiring that the evaluation process continue. (R. 127-29.) Plaintiff does not challenge these findings.

The ALJ then considered Goree's residual functional capacity ("RFC"), which is defined as "the most [a claimant] can do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ determined:

> **6. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except he can lift and carry 50 pounds occasionally and 25 pounds frequently, sit for six hours in an eight-hour workday, and stand and walk for five hours in an eight-hour workday. He can frequently push and pull with the right lower extremity. He can occasionally climb ramps and stairs. He can never climb ladders, ropes, or scaffolds. He can frequently balance, stoop, kneel and crouch. He can occasionally crawl. He can operate foot controls with the bilateral lower extremities. He can tolerate moderate background noise, such as business office where typewriters are used, department store, grocery store or light traffic. The claimant can concentrate in the workplace for two hours before requiring a break. He is limited to performing simple, routine tasks. He can occasionally interact with supervisors, coworkers and the general public. He can frequently respond appropriately to changes in a routine work setting. He is precluded from production rate pace work, but rather goal-oriented work.**

(R. 129) (bold in original). Applying this RFC and in light of the fact that Goree's past relevant work was skilled or semiskilled, the ALJ found at Step Four that Plaintiff was unable to perform any past relevant work. (R. 138.) The ALJ then proceeded to Step Five to determine whether Goree was capable of performing any other jobs that exist in significant numbers in the national economy. This analysis took into account that Goree was in the "advanced age" category as of his

alleged disability onset date and that he had at least a high school education. (R. 138.) Inasmuch as the ALJ had found that Goree could perform a limited range of what he characterized as medium work, and in light of the testimony of a vocational expert ("VE") concerning jobs that could be performed by someone with Goree's vocational profile and RFC, the ALJ concluded that there was other work that Goree could perform. (R. 139.) Accordingly, the ALJ found that Goree had not been under a disability as defined in the Act at any time from June 1, 2015 to the date of his decision. (R. 140.)

## IV. DISCUSSION

Plaintiff contends that the ALJ's finding as to his RFC, which led to the adverse finding at Step Five, is the product of legal error and is not supported by substantial evidence. He sets forth three bases for his request that the Court reverse the ALJ's decision. First, he contends that the ALJ improperly discounted RFC opinions rendered by his treating physician, Dr. Jones, and the examining orthopedist, Dr. Cornejo. (Pl. Br. at 8.) Second, he asserts that the ALJ erred in finding that he did not require a cane for ambulation. (*Id.* at 16.) Third, he asserts that the ALJ failed to consider his work history when assessing the credibility of his complaints. (*Id.* at 19.)

### A. The ALJ adequately supported his decision to give little weight to aspects of the opinions of a treating physician and a consulting physician.

Plaintiff contends that "[t]he ALJ erred by failing to evaluate the medical opinion evidence in accordance with the regulations, Agency policy and Third Circuit precedent" in that the ALJ did not adopt opinions of Dr. Jones, his treating physician at the VA, and Dr. Cornejo, an examining physician, despite their first-hand experience with and evaluation of him. (Pl. Br. at 3.) He asserts at length that "[t]he ALJ did not give 'good/specific/supported' reasons for rejecting the medical opinion evidence," complaining principally that the ALJ discussed the opinions of Dr. Jones and Cornejo "*in isolation from each other*, without acknowledging that they support each

7

<u>other</u> in their agreement that his ability to work is more limited that the ALJ's RFC describes." (*Id.* at 4, 8 (all emphasis in original).).). He complains that the ALJ's failure to acknowledge "the consistency between these critical pieces of evidence is clear error which undermines the ALJ's analysis of the evidence." (*Id.* at 8.) He faults the ALJ for not manifesting his awareness of the Agency's preference for opinions from treating and examining sources and for failing to indicate whether Dr. Jones's status as a treating physician factored into his analysis of her opinion. (*Id.* at 8-9.) He criticizes the ALJ's decision for "couch[ing]" his discussion of the opinions of Drs. Jones and Cornejo "in a minimalistic and confusing reliance on the 'reasons discussed'" earlier in the decisions, which is "difficult to apply" and "fails to provide this Court with a logical bridge between the evidence and the rejection of these two opinions." (*Id.* at 9.) He argues that when the record is viewed in the proper light, the opinions of Drs. Jones and Cornejo are consistent with and supported by the record. He also contends that, inasmuch as the ALJ gave only "partial weight" to the opinion of the state agency reviewing physician, the ALJ's RFC finding was "based upon his own interpretation of raw medical data." (*Id.* at 14.) He asserts that their opinions establish that he is limited to "light" exertional work which, coupled with his "advanced age" category and history of skilled work, would direct a finding that he is disabled pursuant to Rule 202.06 of the Medical Vocational Guidelines ("the Grids"). (*Id.* at 4-7.)[2]

---

[2] Pursuant to this Rule, an individual in Plaintiff's age category and with his educational background who is limited to light, unskilled work is disabled. "Light work" involves "a good deal of walking or standing," or "sitting most of the time with some pushing and pulling of arm or leg controls," with frequent lifting of up to 10 lbs. and occasional lifting of 20 lbs. *See* 20 C.F.R. § 404.1567(b). Medium work is defined as involving "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." *Id.*, § 404.1567(c). The ALJ found that Goree could stand and/or walk approximately 5 hours in an 8 hour workday but that he had the ability to lift and carry 25 lbs. frequently and 50 lbs. occasionally, which is more than that required for light work.

Following our review of the opinions at issue, and as we set forth below, we cannot agree with Plaintiff that the ALJ violated applicable regulations when he reconciled the varied opinions concerning Plaintiff's physical and mental abilities and the comprehensive records in this case, which included over 2,000 pages of materials from the VA. We first set out the standards by which medical opinions are to be evaluated by adjudicators. We then analyze the opinions themselves and the ALJ's reconciliation of them with the other evidence of record. We address the opinions in the order in which the ALJ discussed them: Dr. Chopra, the state agency reviewing physician who gave an opinion in August 2017 based on review of the record compiled as of that date; Dr. Cornejo, the consultative examiner who gave an opinion after a single examination in July 2017; and Dr. Jones, the treating physician at the VA who rendered an opinion in September 2018 in advance of Goree's hearing.

### 1. Applicable regulations

The Commissioner's regulations and rules emphasize that the RFC assessment that an adjudicator makes "must always consider and address medical source opinions," and that if the RFC finding "conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p. Social Security Ruling 96-8p further provides that:

> Medical opinions *from treating sources* about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the adjudicator must give it controlling weight.

SSR 96-8p (citing SSR 96-2p, "Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions," and SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner") (emphasis added). The standards do not, however, specify that

9

adjudicators employ any particular language as they address medical source opinions as part of their RFC assessment.

### 2. Dr. Chopra's opinion

The first medical opinion that the ALJ described in his decision was that of Dr. Chopra, who reviewed the state agency file on August 16, 2017 and completed a portion of the state agency Disability Determination Transmittal form, supporting the decision rendered upon Goree's request for reconsideration. With regard to an evaluation of symptoms, Dr. Chopra found that Goree's statements about the intensity, persistence, and functionally limiting effects of his reported pain and weakness were not substantiated by the objective medical evidence alone. In response to a question about what factor he found most informative in assessing the credibility of Goree's statements about his symptoms, he identified Goree's activities of daily living and the location, duration, frequency and intensity of his pain and other symptoms. (R. 261.) When Dr. Chopra completed his physical residual functional capacity assessment, he explained the various limitations he included with reference to a paragraph of additional explanation. There he noted that Goree indicated in his Disability Report form that his condition had not worsened since his initial application, as well as the fact that he had not been "fully cooperative in completing necessary forms." (R. 263.) He recounted the observations from the consultative examination of Dr. Cornejo, including that Goree was "in no distress," had "normal transfers" from the examination table, was "comfortable seated," and showed "no focal deficits" in the upper extremities. (*Id.*) With respect to the condition of Goree's ankles, he noted that Dr. Cornejo measured a full range of motion, with "no motor, sensory, [or] reflex deficits" in the lower extremities, and "no laxity or instability" in the ankles. (*Id.*) He acknowledged that Dr. Cornejo found a limited range of motion in the lumbar spine but no tenderness or spasms. (*Id.*) He also commented on the "limp noted [by Dr. Cornejo] during examination that improved after leaving

examination office and [claimant] carried backpack on his back," and the fact that Goree "used no assistive device." (*Id.*) Dr. Chopra recounted that the x-ray of the lumbar spine showed degenerative disc disease but that the x-ray of the left ankle was normal. (*Id.*). He repeated that Dr. Cornejo "noted inconsistencies in [range of motion of the lumbar] spine and gait," and that Goree had "good [ranges of motion] when distracted" and "no significant neurological deficits." (*Id.*)

The ALJ parsed the RFC opinion of Dr. Chopra -- which he found to be "partially consistent with the evidence of record," (R. 136) -- extensively in his decision. The ALJ gave "great weight" to Dr. Chopra's opinion that "the claimant can generally perform medium exertion," (R. 136), but "further [found] that the claimant is limited to standing or walking five hours in an eight-hour workday," as opposed to the six hours indicated by Dr. Chopra (*Id.*) Accordingly, the ALJ accorded "partial weight" to Dr. Chopra's opinion regarding Goree's exertional abilities. (*Id.*) He gave "great weight" to Dr. Chopra's opinion that Goree did not require an assistive device, noting evidence in the record that "the claimant generally walked with a normal gait and demonstrated intact neurological functioning and a normal ability to stand and walk when distracted (Exs. 4F, 5F and 10F)," and specifically noting Goree's "improved gait until [sic] leaving Dr. Cornejo's examination." (R. 136.) The ALJ gave "less weight," however, to the portions of Dr. Chopra's opinion that minimized or overlooked effects of Goree's tinnitus impairment and certain effects of his ankle condition. (*Id.*) His reconciliation of these aspects of Dr. Chopra's opinion with the evidence of record yielded the ALJ's additional findings that Goree could never climb ladders, ropes or scaffolds (as opposed to "occasionally" do so); he could occasionally crawl and climb ramps and stairs (as opposed to "frequently" do so); he could

frequently operate foot controls (despite limitations in the right lower extremity); and he could occasionally be exposed to heights and moving mechanical parts. (R. 136, 262.)

### 3. Dr. Cornejo's opinion

The second opinion concerning physical RFC that the ALJ described in his decision was that of Dr. Cornejo, the examining but non-treating physician whose report was discussed at length by Dr. Chopra. The ALJ included his own lengthy paragraph describing the July 2017 consultative examination of Plaintiff by Dr. Cornejo, found at Exhibit 3F of the hearing record. The following comments in the ALJ's written decision discussing Dr. Cornejo's report, which was found at Exhibit 3F of the record, demonstrate the scope of his analysis and the conclusions he drew from Dr. Cornejo's report:

- "[Goree] was able to get on and off the examining table, and go from lying down to sitting up position ([Ex. 3F)].). He was able to dress himself. He was comfortable in the seated position during the interview (*Id.*). These findings are inconsistent with disabling physicals [sic] symptoms." (R. 132.)

- "Examination of his lower extremities showed no evidence of joint deformity or instability ([Ex. 3F.]). There was a healed surgical scar along the right lateral ankle consistent with right distal fibula fracture in 2014 (*Id.*). There was tenderness along the medial malleolus of the left ankle. Otherwise, the claimant's lower extremity joints showed normal range of motion, normal reflexes and intact sensation (*Id.*). Notably, he had full strength bilaterally in the muscle groups of the lower extremities…. There was a negative anterior draw test of the left foot and no evidence of laxity or instability of both ankles (*Id.*). These findings significant [sic] weaken the claimant's allegations of disabling lower extremity impairments." (R. 132-33.)

- "There was no evidence of atrophy of the lower extremities as the circumferential diameter measurement of both lower legs was equally 13" (*Id.*). This finding significantly weakens the claimant's allegations of reliance on an assistive device for ambulation." (R. 133.)

- "Examination of the claimant's lumbar spine showed normal lordotic curve, decreased flexion at 40 degrees; however, he was also able to bend his back to 90 degrees in order to pull up his pains [sic] above is [sic] knees. ([Ex. 3F].). Notably, when distracted,

the claimant had good fluid mobility of the lumbar spine (*Id.*). These inconsistent findings weaken the claimant's allegations of disabling lumbar symptoms and support an ability to occasionally crawl, and frequently stoop, kneel and crouch." (R. 133.)

- "There was no significant spasm and tenderness to direct palpation along the paralumbar musculature and lumbar spinous process, which is consistent with the claimant's positive response to muscle relaxants ([Ex. 3F].). Additionally, there was no lower back pain or radicular symptoms on sitting or supine straight leg raising maneuver testing, which weakens his allegations of radicular symptoms (*Id.*)." (R. 133.)

- "Notably, even though the claimant had a limp on the left during the evaluation, he was observed walking with more a [sic] physiological gait while wearing a backpack as he left the examination office ([Ex. 3F].). His limp on the left was less obvious, and he was able to squat down, heel walk and toe walk (*Id.*). Moreover, he did not require the use of an ambulation aide [sic] (*Id.*). These observations are inconsistent with the claimant's allegations that he cannot stand or walk for prolonged periods and requires an assistive device for all ambulation." (R. 133.)

(R. 132-33.). This lengthy discussion of the details of the narrative report that accompanied Dr. Cornejo's RFC assessment form demonstrates that the ALJ was certainly aware of the fact that Dr. Cornejo personally examined Goree.

Dr. Cornejo rendered a contemporaneous opinion concerning Goree's functional capacity, which the ALJ addressed in the later portion of his decision in which he set out the various medical opinions. He accepted Dr. Cornejo's opinion only in part, explaining:

> Dr. Cornejo opined the claimant may have difficulty with prolonged walking and standing, can sit for a reasonable amount of time with needed breaks, and has no significant balance limitations (Ex. 3F). He further opined the claimant has good use of his upper extremities for movements such as reaching and has good functionality of his right and left hands (*Id.*). Dr. Cornejo opined the claimant can handle fine and small sized objects, has no significant limitations to fingering, such as picking and pinching objects (*Id.*). Finally, he opined the claimant may have difficulty with heavy lifting, but can do medium lifting occasionally as well as light and/or sedentary activity frequently (*Id.*). For the same reasons discussed regarding Dr. Chopra's opinion, the undersigned gives great weight to Dr. Cornejo's opinion that the claimant is precluded from heavy lifting

13

and has no reaching, balancing or manipulative limitations, and little weight to his remaining opinion because it is overly restrictive.

(R. 136.)

### 4. Dr. Jones's opinion

The third and final medical opinion concerning physical RFC was rendered by Dr. Jones, with whom Goree treated at the VA for left ankle and back pain. When Goree was working as a forklift operator in an Amazon warehouse in 2015, and in light of complaints of back pain, Dr. Jones authored a note asking that he not be required to engage in repeated lifting of more than 50 lbs. (R. 533.) Dr. Jones also prescribed medications for pain, including Flexeril, Motrin, Tramadol, and Percocet. (R. 514.)

In advance of his November 2018 hearing before the ALJ, Goree obtained an opinion from Dr. Jones as to the work-related limitations he faced as a result of various impairments. The opinion was completed in form provided by counsel. The ALJ's decision described it as follows:

> Leah Jones, M.D., *a treating physician*, submitted [a] Treating Source Statement dated September 2018 (Ex. 7F). Dr. Jones opined the claimant will be absent from work four or more day[s] per month, off task 25% of the workday[3] and requires the option to lie down or recline for 30-minute periods, two times per day, and requires the use of a cane if ambulating more than 50 feet ([Ex. 7F].). She further opined the claimant can occasionally lift and carry ten and 20 pounds, sit up to eight-hour[s] in an eight-hour workday, and stand and/or walk one hour in an eight-hour workday (*Id.*). She opined the claimant can occasionally reach overhead, push and pull, frequently reach in all other directions, and never perform any postural maneuvers (*Id.*). Dr. Jones opined the claimant can rarely use left foot controls and frequently use right foot controls (*Id.*). Finally, she opined the claimant can never work around unprotected heights, rarely operate a vehicle and work around extreme cold, occasionally work around extreme heat and vibrations, and

---

[3] The form provided a number of percentage options from which to choose in response to the question of the percentage of the day that symptoms would interfere with attention and concentration to perform even simple tasks at work. (R. 2408.)

14

           continuously work around moving mechanical parts and pulmonary irritants (*Id*.).

(R. 136-37 (emphasis added).) After reciting these aspects of Dr. Jones's opinion, and before moving on to address the psychiatric opinions offered in the case, the ALJ concluded the above paragraph with the statement: "For the same reasons discussed regarding Dr. Chopra's opinion, I give little weight to Dr. Jones' opinion." (R. 137.)

        **5.      The ALJ adequately reconciled the various opinions concerning Goree's physical RFC.**

As to Plaintiff's first point, that the ALJ did not display an awareness that he was giving little weight to a treating physician opinion, we do not find so simple a rule to apply. The ALJ demonstrated that he was aware of Dr. Jones's relationship with Plaintiff, as his paragraph opened with the descriptor of Dr. Jones as "a treating physician" and her opinion was set forth in a document entitled "Treating Source Statement." (R. 136.).

As to Plaintiff's second point, that the ALJ did not reflect an awareness of the consistency of Dr. Jones's opinion with that of Dr. Cornejo, we again believe Plaintiff has identified no error. There were important differences between the opinions of Drs. Cornejo and Jones. Dr. Cornejo was not asked to opine about whether Goree's "symptoms" – which from Dr. Jones's perspective included depression, PTSD, and insomnia (R. 2408) – would interfere with attention and concentration or lead to absences from work, as Dr. Jones found. She found a cane was needed to ambulate effectively, whereas Dr. Cornejo observed otherwise and specifically opined that a cane was not used nor required. (R. 704.) While there was consistency regarding Dr. Cornejo's observation that Goree "may have difficulty with prolonged walk[ing]" and could do medium lifting only occasionally, he was not asked to opinion on the number of hours that Plaintiff could walk or stand. (R. 702)

As we review the "reasons discussed regarding Dr. Chopra's opinion," to which the ALJ referred when stating the weight he gave to the opinions of Drs. Cornejo and Jones, we find that it provides sufficient justification for why he gave little weight to Dr. Jones's opinion concerning Goree's projected absences from work, a need for the option to lie down or recline for two 30-minute periods, a limitation to only 1 hour of standing or walking in an eight-hour workday, and the need for a cane for ambulation beyond 50 feet. The ALJ's emphasis on Dr. Cornejo's objective examination results and observations suggesting exaggeration by Plaintiff undermined his credibility regarding the extent that his ankle impairment precluded effective ambulation without a cane and that lifting and carrying restrictions rendered him unable to perform medium work.

The ALJ clearly stated his finding that Goree's statements concerning the intensity, persistence, and limiting effects of the symptoms caused by his medically-determinable impairments were "not entirely consistent" with the medical evidence and other evidence in the record. (R. 130.). With regard to Goree's physical limitations, he cited to "the claimant's positive response to conservative care in conjunction with his consistently normal neurological functioning with some paraspinal tenderness," leading him to find that Goree could "perform medium exertional activities with the exception of standing or walking five hours in an eight-hour weekday, occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, and frequently balance, stoop, kneel and crouch." (R. 130-31.) He further found that Goree's "generally intact gait despite some left ankle symptoms is not consistent with his allegations of disabling left ankle symptoms and need for an assistive device." (R. 131.) He summarized that Goree's "left ankle impairment was treated conservatively throughout the relevant period and clinical examinations generally documented some tenderness and stiffness." (*Id.*) He continued that "[w]hile there is evidence of some antalgic gait due to left ankle pain, the claimant generally walked with a normal

gait and demonstrated normal ability to stand and walk when distracted." (*Id.*) The ALJ concluded that, "[f]or these reasons, the undersigned finds that the claimant does not require an assistive device, and can perform medium exertional activities with the exception or standing or walking five hours in an eight-hour workday, occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, and frequently operate of [sic] foot controls." (R. 131-32.)

It is clear that the ALJ was aware of the different opinions in this case by the three different medical sources, each of whom had a different role and perspective. He demonstrated his understanding of the opinions and clearly stated what aspects he took from each, relying principally on the opinion of the state agency doctor who had the most knowledge of the disability system and who had the benefit of a substantial record in addition to the report of the experience of Dr. Cornejo. We conclude that the ALJ cited to sufficient evidence supporting his decision to decline to adopt the suggestions in Dr. Cornejo's opinion regarding prolonged standing/walking and exertional level, as well as the more particular opinions of Dr. Jones in these regards.

> **B.     The ALJ's finding in the RFC assessment that Plaintiff did not require the use of a cane was supported by substantial evidence.**

Plaintiff next contends that the RFC finding was not supported by substantial evidence in that the finding did not reflect a need for a cane despite evidence that he often used one. While he does not point to record evidence that a physician *prescribed* him a cane, Plaintiff recounts the many instances in the record in which it was noted that he used a cane and notes that "no physician opined that a cane was *not* necessary." (Pl. Br. at 16 (emphasis added).) He faults the ALJ for supporting the notion that he had a normal gait by citing to records involving treatment for other impairments. He acknowledges one record cited by the ALJ from an orthopedic visit at the VA in which the provider noted that when he was distracted, Plaintiff was able to stand and walk. (R.

763.) Plaintiff counters that the physician there at least indicated he would benefit from a brace and that x-rays would be repeated in 4 months. (Pl. Br. at 17; R. 761-64.)

Plaintiff's contention here essentially invites the Court to re-weigh the evidence. The ALJ was well aware of the question of whether Plaintiff required a cane in order to walk. He addressed the issue in the context of his Step Two analysis of Listings 1.02 (Major Dysfunction of a Joint) and 1.04 (Disorders of the Spine). (R. 127.) He relied heavily on the fact that during the CE examination in July 2017, Goree walked with a limp during the examination yet upon leaving the office, was observed "with a more physiological gait," in which the limp was less obvious and did not require him to use an ambulation aid. (*Id.*). The ALJ also continued:

> Furthermore, during this examination, the claimant stated that he has limped on the left foot since 1983; however, this allegation is inconsistent with the physical examination showing no evidence of atrophy of the left leg compared to the right leg (Ex. 3F/5).

(R. 127.) These facts provided substantial evidence upon which the ALJ could discredit Plaintiff's statements about the need for a cane at that time and about his having had ambulation difficulties in the past. We do not find this argument to require the ALJ's decision be vacated.

### C. The ALJ did not commit reversible error in evaluating Goree's credibility without reference to his work history.

In his final argument seeking remand, Plaintiff contends that the ALJ's assessment of the credibility of his complaints is also "defective" in that the ALJ failed to acknowledge his "strong work history." (Pl. Br. at 19.) He points to 20 CFR § 404.1529(c)(3), SSR 96-8p, and SSR 16-3p regarding the relevance of a claimant's work history and work attempts when assessing the credibility of a claimant's contention that he is unable to work due to his impairments. He notes that the record documented qualifying earnings in 110 quarters over his 38-year work history, including 5 years of service in the U.S. Navy. (*Id.*)

The ALJ recounted Plaintiff's work history in his analysis at Step Four, which requires a comparison of the RFC to the claimant's past work. There he noted that Goree had a past relevant work history as a maintenance electrician, a building maintenance worker, and a forklift operator – all of which were semiskilled or skilled positions – and accepted that Goree was now unable to perform that work due to his mental deterioration. (R. 138.) With respect to Plaintiff's work history overall, the ALJ's decision also referred to Plaintiff's military service, during which he incurred the original injury to which he attributed his left ankle pain. (R. 131.) The ALJ also recognized that Goree engaged in work as an electrician during the second and third quarters of 2016, leading to an analysis of whether the work amounted to substantial gainful activity. (R. 126.) *See also* R. 131 (noting that Goree postponed surgery offered to him for left ankle "because he had just started a new job").

The ALJ did not explicitly reconcile Plaintiff's substantial work record with his findings that Plaintiff's complaints about his functional limitations were not entirely consistent with the record as a whole. But the Regulations did not require the explicit discussion that Plaintiff suggests. They instead require only that the ALJ "consider all of the evidence presented, including information about [the claimant's] prior work record, [his] statements about [his] symptoms, evidence submitted by [his] medical sources, and observations by [Agency] employees and other persons." 20 CFR §404.1529(c)(3).[4] The ALJ satisfied his obligation in this regard.

An appropriate order follows.

---

[4] The other sources cited by Plaintiff in addition to this Regulation, SSR 96-8p and SSR 16-3p, do not appear to require anything further of ALJs as to consideration of a claimant's prior work record apart from what is necessarily encompassed within Steps Four and Five of the sequential evaluation.